## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No: 21-CR-403 (RC)** |
| | : | |
| **NICOLE PRADO,** | : | |
| **Defendant.** | : | |

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

Defendant Nicole Prado submits this Memorandum to assist the Court in imposing a reasonable sentence that is sufficient, but not greater than necessary, to meet the sentencing goals of 18 U.S.C. § 3553(a) for her conviction of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).[1]

Based on the factors set forth in Section 3553(a), Ms. Prado's limited actions, her exemplary post-arrest conduct and cooperation with the government, full acceptance of responsibility, and her essential responsibilities as primary caregiver for her 6 month-old infant daughter and 2 year-old son, counsel for Ms. Prado respectfully submits that a sentence of 12 months supervised probation, with conditions including 60 hours of community service, $500 restitution, would best serve the interests of justice without being excessive.

### DISCUSSION

**HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Nicole Prado is a first generation Bolivian-American, who was born in Maryland.  She is a 30 year-old wife and full-time mother of two.  She holds a college degree in graphic design. Both her children are below the age of three.  Her son is 2 years old and her daughter is nearly

---

[1] The offense is a Class B misdemeanor that meets the definition of a "petty offense."  A term of supervised release is inapplicable. The U.S. Sentencing Guidelines do not apply.

6 months old and still breastfeeding.  Ms. Prado's husband works full-time as a construction manager.  He is the primary breadwinner for the family and his work requires him to travel overnight several days a month.  In addition to being a full-time mother, Ms. Prado works from home — on a part-time basis — for her husband's company.  Much of her work is performed at night after her children go to sleep.

Ms. Prado is the eldest of three siblings. Her parents separated when she was ten. Prior to the divorce, Ms. Prado's younger brother suffered life-threatening injuries that left him a paraplegic.[2] Having witnessed the tragedy, Ms. Prado remembers it vividly still. Her brother was flown to the hospital, placed in a medically-induced coma, and remained hospitalized for an extended period of time.

The resulting stress contributed to the break up of Ms. Prado's parents. Their divorce was contentious and culminated in her mother removing her and her brothers from the country without their father's permission. Their mother took them to Bolivia, where they lived without proper supervision for several months. Though Ms. Prado was just 13 years old at the time, she took on the responsibility of caring for her younger brothers. In his letter to the Court, her father writes: "Nicole being the oldest, always demonstrate [sic] the kindness and love for her little brothers. … when her mother took my children's [sic] to Bolivia and left them by themselves without my permeation (sic) to keep them away during the divorce she was the one who took care of her little brothers." [3] Echoing this sentiment, Nicole's brother, Julio Jr, explains:

> I have known Nicole to be very caring when it comes to her family and animals. …
> She has helped me in various occasions mentally with my depression, as well as
> physically as I could not always move or accomplish normal physical tasks as I can

---

[2] *See* Exhibit 1 (letter from Julio Prado, Jr.)

[3] *See* Exhibit 2 (Letter from Julio Prado, Sr).

now. Before I became more independent as I am now I could not do a lot of things such as transfer out of bed, dress myself or go to the bathroom by myself. Nicole has helped me during numerous occasions to complete these physical tasks as my mom was always at work.[4]

Still today, Nicole is consistently described by those her know her best as kind, compassionate, and a natural caregiver. In his letter to the Court, Nicole's father-in-law writes:

My daughter-in-law is a compassionate person… In the three years I have known her, she has been a caring wife and mother and an attentive daughter-in-law. I am a disabled New York Jew who is an ardent liberal, and Nicole has always expressed respect and interest in my heritage, beliefs and well-being.[5]

Ms. Prado's cousin writes in her letter:

I have always known [Nicole] to be upbeat, kind, positive, and to have a light hearted bright outlook on life… In 2016, I became a mom for the first time and although she had just had surgery she came to visit me at the hospital and brought my son a stuffed animal. … she was one of the people I could count on to help me with babysitting. … She would come over, spend time with my son and relieve me of the hustle and bustle of being pregnant with a toddler. I never paid her. It was always just her way of being there for me. … She is someone I know I can trust, who sparks joy with her presence, and who is a loving aunt to my kids. I have never known her to be violent or hateful.[6]

These same qualities are discussed by Ms. Prado's close friend, who writes:

Mrs. Prado is known for being a loving and dedicated mother. … Ever since I met Nicole, she has been in the role of a caretaker. …When Nicole became pregnant with her first child, I had no doubt that she would excel in her role as a mother. Soon after, Nicole became pregnant with a second child and has ever since served as the primary caretaker of both kids. … She is a devoted mother and wife, dedicating her life to the well-being and unity of her family.[7]

Yet another cousin of Ms. Prado's describes her as "a sweet supportive wife, lovely and nurturing mother, great listener, a person I can count on."[8]

---

[4] *See* Exhibit 1

[5] *See* Exhibit 3 (letter from Jeffrey Ranbom).

[6] *See* exhibit 4 (letter from Laura Clavijo).

[7] *See* Exhibit 5 (letter from Christian Camacho).

[8] *See* Exhibit 6 (letter from Cristina Ayala).

*Politically Diverse Affiliations*

Since her teenage years, Ms. Prado has been interested in politics.  When she was just 17, she attended her first political event - President Barack Obama's inauguration on January 20, 2009.[9]  She attended the event alone, riding and navigating the metro on her own, so that she could witness the first African-American President be sworn in and take office.   Years later, she supported Senator Bernie Sanders in his 2016 presidential bid to become President.  She attended several of his rallies,[10] did phone banking and even went door to door to support his campaign. She still has the 2016 email exchange between her and her college professor regarding her request to attend the Sanders rally.  In it, she wrote "Good morning Prof.! I was wondering if it would count as an excused absence to go see Sen. Bernie Sanders speak at a rally today from 1 to 3pm [I'll attach the screenshot to this email]. After the rally, the plan is to go back for open studio. Hope you're having a lovely day. Kind Regard, Nicole Prado".[11]

After Donald Trump was elected President, Ms. Prado began dating her future husband, whose political views were more conservative than hers.  She began listening to conservative commentators and media outlets and found that, while she did not like President Trump's delivery, she agreed with some of his agenda.  Her support for then President Trump grew stronger in early 2020, after the birth of her first child.  Nicole suffered from postpartum depression and her condition was further amplified by the lockdowns across the country due to COVID-19.  Then her husband lost his job due to shutdowns and his private client's stopped calling.   They went from having two incomes to none.  Panic set in.  It was roughly a month

---

[9] *See* Exhibit 5 (letter from J. Ranbom).

[10] *Id.*

[11] *See* Exhibit 9 (email exchange with professor).

before Nicole's husband found another job.  As they endured the stress, anxiety and uncertainty that comes with financial instability, Nicole found solace in Trump's push to keep the country open and she became an ardent supporter.

**NATURE AND CIRCUMSTANCES OF THE OFFENSE**

On January 6, 2021, Ms. Prado was living in Gaithersburg, Maryland.  She was enrolled in a digital photography class at Montgomery College[12] and she had a class assignment to take "a series of photographs covering an event over which you have no control. Cover the event using photojournalism style to help the viewer who did not witness it to know what happened."[13]

When Ms. Prado learned of the planned "Stop the Steal" rally at the Ellipse in Washington, D.C. it seemed, to her, the perfect opportunity to both support President Trump and take photographs for her class assignment. That morning, she took the metro into Washington, D.C. and walked to the Ellipse to attend President Trump's speech. She watched the entire speech and when President Trump urged his supporters to march to the Capitol to protest what he repeatedly characterized as a stolen and rigged election, Nicole followed his guidance. Her intentions were to peacefully protest and take photographs for her photojournalism assignment. At no point did she engage in violence. At no point did she engage in vandalism. At no point did she encourage or incite others to do so.

***Entry into the Capitol***

According to to the FBI, Ms. Prado entered the building at 2:35 p.m. CCTV video footage provided by the government in discovery captures about 15 minutes of time leading up

---

[12] *See* Exhibit 10 (Course Transcript).

[13] *See* Exhibit 11 (announcement for photojournalism class assignment).

to Ms. Prado's entry, the moment she entered the building, and several minutes following her entry.  At minute 13:43 of the 20 minute video, a protestor inside the building opens the the door (normally, not with undue force) as he exits the building.  Thereafter a number of protestors enter the



building, including Ms. Prado who enters at minute 15:34 of the video and is indicated with the green arrow, above.

Notably, when Ms. Prado entered the Capitol, the doors were open[14] and bore no visible signs of damage.  The video footage shows no indication of violence or vandalism at the

_____

[14] In the video, the doors appear to be held open by an internal locking mechanism, rather than propped open by a physical object.

entryway when she enters, nor any effort on the part of law enforcement to prevent Ms. Prado

from entering.  After walking down a short hallway, Ms. Prado encountered a second set of doors

that lead further inside the Capital.  These doors, too, were undamaged.  Uniformed officers were

standing beside the door closest to Ms Prado and she thanked one of them as she walked through

it.  Neither that officer, nor a second uniformed officer who was standing behind him, made

any effort to stop Ms. Prado or others from entering.  In fact, the man who entered directly in

front of Ms. Prado is seen on video extending his hand toward the officers for a handshake.



Screen shot from CCTV footage.  Photo is taken 3 seconds into a 20 second video clip.  Yellow arrow indicates the first
uniformed officer.  Green arrow indicates Ms. Prado.



Screen shot from CCTV footage.  Photo is taken 9 seconds into a 20 second video clip. The red arrow indicates the second uniformed offer.  Blue arrow indicated extended hand of protestor in front of Ms. Prado as he goes for a handshake. The green arrow indicates Ms. Prado's hand (her body is blocked from view by the man behind her)

   Once inside the Rotunda, Ms. Prado took several photojournalism-styled photographs.

She did not take any "selfies."  She did not engage with other protestors.  She did not yell or jeer

or antagonize police.  She did nothing to incite the crowd.

   From the Rotunda area, for the next five minutes or so, she aimlessly wandered[15] about

the building, following the crowd.  She began to feel uncomfortable when she encountered a man

drinking a beer, which he purportedly stole from an office in the building. Upon leaving the area

———————————

[15] Prior to this day, Ms. Prado had never been inside the Capitol and she was unfamiliar with the
building's labyrinthine layout.



Screen shot from CCTV footage.  Photo is taken 10 seconds into a 20 second video clip. The red arrow indicates the second uniformed offer.  Blue arrow indicated extended hand of protestor in front of Ms. Prado as he goes for a handshake. The green arrow indicates Ms. Prado's red ball cap (her body is blocked from view by the man behind her)

where she encountered the unknown man, she immediately began to search for a public

restroom.  For the next 5-10 minutes, she searched for signs of a public restroom.  As she was

looking for a restroom, she encountered a police officer who questioned her briefly and

instructed her to leave. Prior to encountering this officer, Ms. Prado is seen on CCTV crossing

paths with several other uniformed officers, none of whom interacted with her nor asked her to

leave.  Ms. Prado politely answered the officer's questions and complied with his directions to

leave.  She even verbally intervened on the officer's behalf by admonishing another female

protester "ma'am, wait," when the protestor did not heed the officer's command to "hold" before descending the stairs.

According to FBI reports, Ms. Prado was in the building from 2:35pm til 2:52pm — a total of 17 minutes.  Of those 17 minutes, 5-10 minutes were spent looking for signs of a public restroom and 2-3 minutes were spent in the presence of police, politely answering their questions and complying with their directives to exit the building.

Ms. Prado did not come to Washington, D.C. intending to enter the Capitol or disrupt the certification of the Electoral College.  She had no weapons. She committed no violence. She damaged no property, nor did she encourage or incite others to do so.  She made no incendiary remarks or threats.  In short, while she is guilty of the misdemeanor petty offense of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. §§ 5104(e)(2)(G) & 5109(b), she exhibited no aggravating conduct during the event.

**POST-ARREST CONDUCT AND ACCEPTANCE OF RESPONSIBILITY**

Nor did Ms. Prado exhibit any aggravating conduct after the event. She posted nothing online to celebrate the violence or spew hateful rhetoric. While her husband posted one video and two photos to his private Instagram account, Ms. Prado did not ask him to do so, nor did she encourage it. The 10 second video was spontaneously recorded by Ms. Prado's husband, who gave her no advanced warning.  In it, he does all the speaking.  He briefly pans to Ms. Prado, facetiously introduces her as "the new Congresswoman" and claims that she "stormed" the Capitol that day.  In the video, Ms. Prado offers a nervous chuckle and makes a half-hearted effort to cover her face behind the small flag she is carrying. The video was later viewed by

members of Ms. Prado's family and caused a great deal of internal strife for Ms. Prado and her family.  A concerned citizen later reported Ms. Prado to the FBI.

Very shortly after Ms. Prado was contacted by the FBI, she arranged, through undersigned counsel, to voluntarily turn herself in. She was released on conditions (including pretrial supervision) the same day.  Upon request of the government, Ms. Prado voluntarily provided the government with each item of clothing she wore on January 6, a small handheld flag that she carried on January 6, her cell phone (along with the password to the phone), and digital copies of the photographs she took from outside and inside the Capitol. She also consented to a forensic evaluation of her phone, as did her husband.

After entry of her guilty plea, and pursuant to her plea agreement,[16] Ms. Prado submitted to an interview about her conduct in this case. For 90 minutes, she candidly answered all questions posed by the FBI and government counsel. Ms. Prado has fully complied with each and every request made of her by the government to date in the case. She has also remained fully compliant with pretrial services and all conditions of her release in the nearly seven months that her case has been pending.

Finally, unlike dozens of other defendants, Ms. Prado did not destroy evidence.  Although she removed a number of photographs from her phone, before doing so she made sure to preserve the photographs on a thumbdrive, which she voluntarily surrendered to the government. In addition to the thumb drive of photographs, Ms. Prado voluntarily surrendered to the

---

[16] Upon information and belief, the government has demanded that each plea agreement in January 6 cases contain language obliging the defendant to submit to an interview with law enforcement if the defendant was not previously interviewed by police prior to their arrest. Defendants who were questioned — even briefly — by police prior to their arrest were not required to do so. Not all defendants have been asked to follow through on the proffer obligation in their plea agreements. Ms. Prado was, and she candidly answered all questions posed to her.

government the items discussed above (items of clothing, small handheld flag, phone, husband's phone, passwords to phones, etc.).

**THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE**

Ms. Prado is guilty of the petty offense of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). She conspired with no one. She did not aid, abet, incite or encourage criminal acts by others. She should be judged based on her own conduct and intent, not that of others. In other January 6 cases, the government had advocated that:

> the Court should assess the defendant's conduct during the riot on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.[17]

Here, Ms. Prado came to Washington, D.C. on January 6 for two reasons alone: to exercise her First Amendment rights and to take photographs for her class assignment. She attended President Trump's speech at the Ellipse and when he urged his supporters to march to the Capitol to protest, she followed his guidance. Her intentions were to peacefully protest and take photographs for her assignment. At no point did she engage in violence. At no point did she engage in vandalism or theft. At no point did she encourage or incite others to do so.

---

[17] Govt Sentencing Memo in *United States v. Stepakoff,* 1:21cr96 (ECF 36) at 18-19.

She followed others through a set of open doors that had no signs of damage. She thanked a uniformed officer as she entered.  CCTV footage confirms that at the time and place where she entered, the crowd was not engaging in acts of violence or vandalism.  Once inside, CCTV footage shows her aimlessly meandering about the building taking photographs, not engaging with the crowd. Never having been inside the building before, she was in awe of its beauty.  She had no agenda and no plan. She did not encourage or participate in violence.  While she was briefly on the periphery and in the rear of a crowd that pushed past police, she did not push police and she did not see anyone push or assault police.  Today, the Court has the benefit of viewing the omnipresent CCTV video footage to assess the actions of other individuals in the building, but on January 6, Ms. Prado was witnessing the events from her vantage point as a petite, 5'3 tall woman. The only arguably physical encounter she witnessed occurred all the way across the room from her, when an individual in the crowd appeared to spray a fire extinguisher into the air and in the direction of police who were several feet away. Ms. Prado documented the encounter with her camera and immediately exited the area where the encounter occurred.  She later provided the documentation to the government.

Apart from her action of trespassing inside the building, Ms. Prado engaged in no additional inappropriate or aggravating conduct.  When she saw inappropriate behavior by others, she distanced herself.  When she encountered police, she was polite and cooperative. She was inside the building for just 17 minutes, much of which was spent in search of a public restroom or in the presence of police, answering their questions and complying with their instructions.

Upon leaving the Capitol, Ms. Prado made no incendiary statements or posts on social media. She fully cooperated with the FBI and voluntarily turned herself in. At the request of the government, she tracked down every item of clothing she wore on January 6 and provided it to the FBI. She gave them her phone, the password to her phone, and consented to a forensic examination of the phone. Her husband did the same. After her plea, she met with law enforcement and politely and candidly answered questions for 90 minute*s* about her nonviolent conduct for this petty offense. She has exhibited remorse and contrition and pleaded guilty as quickly as she could, given her unexpected health complications that are discussed below.

The Court, not the government, decides what factors matter to it, but to the extent that the government's factors help place each individual defendant on a spectrum as to their fair and just punishment, the government's factors strongly demonstrate that Ms. Prado fits on the lowest end of that spectrum and that a sentence of a term of probation is appropriate.

**THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MS. PRADO**

Ms. Prado is a 30 year old mother of two with no history of violence and a minimal criminal history.[18] Because she is being sentenced on a petty offense, the U.S. Sentencing Guidelines do not apply. However, even if they did, she would fall within the lowest criminal history category (Criminal History Category I). Simply put, she is not someone whom the public needs to be protected from. The government's argument that, for Ms. Prado's petty offense of nonviolently demonstrating at the Capitol building, taxpayers should pay hundreds of dollars a

---

[18] Her record consists of a single misdemeanor DUI conviction that occurred before she was married or had children, and a traffic related charge that would not qualify as a prior sentencing event under the sentencing guidelines. *See* USSG § 4A1.2(c)(1).

day to incarcerate a mother of two (who is still nursing her infant) for fourteen days — while in the midst of a COVID surge, no less — in order "protect society" strains credulity.

Deterrence has already been achieved through Ms. Prado's arrest, her seven months of pretrial supervision with restrictions, federal conviction, public shaming, and the inescapable notoriety and social stigma of being a January 6 defendant whose photograph has been posted online and in the media. Ms. Prado has been contacted by the press repeatedly and has had to change her username on social media accounts to avoid harassment. The case, and her actions of entering the Capitol Building on January 6, have also significantly damaged her relationships with loved ones. She experienced all of this while pregnant and the stress from the case proved to be deleterious to her health and pregnancy. On August 1, 2021 (roughly six weeks after her arrest), she was admitted to the hospital for signs of premature labor, including cramping and bleeding.[19]  She was placed on bed rest for the duration of her pregnancy, yet still went into labor prematurely and had to have an emergency cesarean section.  Her baby was born one month premature. The consequences of her decision to enter the Capitol on January 6 will forever haunt her, a fact she acknowledges in her letter to the Court "[this] has proven to be one of the worst and costliest decisions of my life; one that has impacted my family every day since then and cost me relationships with people I held close." This case has made it crystal clear to Ms. Prado and the general public that First Amendment expression and protest is not without limitation.

Finally, history and scientific studies have taught us that general deterrence is best achieved not through confinement or excessive sentences, but rather by the certainty of getting caught.  What is more, while not evident from the government's sentencing recommendation in

---

[19] On August 6, 2021, Defense counsel provided the government with a copy of Ms. Prado's hospital discharge record.

this case, the Department of Justice agrees. In May 2016, The National Institute of Justice (the research, development and evaluation agency of the United States Department of Justice) published a newsletter entitled "Five Things about Deterrence."[20]  Among the five fundamental principles cited in the letter, the first four are especially relevant here:

1) The certainty of being caught is a vastly more powerful deterrent than the punishment.
2) Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.
3) Police deter crime by increasing the perception that criminals will be caught and punished.
4) Increasing the severity of punishment does little to deter crime.

For the past thirteen months, the message to the general public that everyone who stepped foot inside the Capitol on January 6 will be found and prosecuted has resonated loud and clear. Entire websites and social media sites, such as SeditionHunters, have been established with the sole focus of identifying suspects and assisting law enforcement. Nationwide hotlines have been set up for anonymous tipsters to report on their friends, family members and acquaintances who entered the Capitol. Every day, images captured on January 6 from the vast network of CCTV cameras inside the Capitol flood the news. Photographs of all the suspects have been posted online and in the national media. Local media, too, abounds with coverage identifying local suspects, posting their pictures and discussing the investigation into their alleged actions.[21]  A

---

[20] *See* Exhibit 10 (NIJ Newsletter).

[21] *See, e.g.*, Jeremy Jojola, *Here are the 12 people with Colorado Ties that Have Been Charged in the Capitol Riot*, 9News, Jan. 6, 2022, https://www.9news.com/article/news/investigations/coloradans-us-captiol-riot/73-83f3ecfc-2fd6-47b8-b5bf-449ffc47f6ea. (last viewed Jan. 30, 2022); Miranda Fulmore, WBHM - NPR News for the Heart of Alabama, *One year later: Alabamians arrested in connection with the U.S. Capitol insurrection*, Jan. 5, 2022, https://wbhm.org/2022/one-year-later-alabamians-arrested-in-connection-with-the-u-s-capitol-insurrection; Erin Vogt, *A year later: More than 20 NJ arrests in Jan. 6 attack on U.S. Capitol*, NJ101.5, Jan. 5, 2022, https://nj1015.com/nj-jan-6-capitol-attack-arrests/?utm_source=tsmclip&utm_medium=referralhttps://nj1015.com/nj-jan-6-capitol-attack-arrests.

sentence of active confinement, or home confinement, is simply not necessary (i.e. greater than necessary) to achieve the goal of general deterrence. A sentence of probation, with conditions including community service and restitution, is neither light nor lenient; it is appropriate and just.

## NEED TO AVOID UNWARRANTED DISPARATE SENTENCES

As of January 30, 2021, 82 of the misdemeanor January 6 defendants have been sentenced.[22]  Of those 82 defendants, 32 received active jail sentences.  That translates to 39%. The clear majority of misdemeanant cases do not merit jail time and have not received jail time. While no two cases contain identical facts, some of the cases bear similarities to Ms. Prado's case and are worthy of mention.

*U.S. v. Eliel Rosa, 1:21cr68.*  On the morning of Jan 6, Mr. Rosa posted a photo online of protestors marching in the street with the caption "and we fight!!!"[23]  Mr. Rosa attended the Trump rally, returned to his hotel room and, learning of the events at the Capitol elected to leave his room to go to the Capitol.[24]  Mr Rosa went to the Capitol "after learning that Vice President Pence was not going to take action." He consciously and thoughtfully intended to join the violent protest.  He entered through the very same doors that Ms. Prado entered — a mere 17 seconds after her.   He walked through many of the same areas as Ms. Prado, though he remained inside the building longer than her.  He, too, appeared to be escorted out by police.  He later turned himself in to law enforcement voluntarily.  On October 13, 2021, he was sentenced by Judge McFadden to one year of probation with 100 hours of community service.

---

[22] *See January 6 Insurrection Sentencing Tracker*, Politico, https://www.politico.com/news/2022/01/04/ jan-6-insurrection-sentencing-tracker-526091#full-table (last visited January 31, 2022).

[23] *See* Government's Sentencing Memo, Case 1:21-cr-00068 (ECF 66).

[24] *See* Government's Sentencing Memo, Case 1:21-cr-00068 (ECF 66).

*U.S. v. Danielle Doyle, 1:21cr324.* Ms. Doyle entered the Capitol through a broken window and remained inside for approximately 24 minutes.[25] She walked through numerous areas of the building, including the Orientation Lobby, the Crypt, the Upper Orient Lobby, the Rotunda, and an interior staircase of the Capitol building knows as the Supreme Court Chambers stairs. She continued to write proudly about her presence and actions several weeks after January 6. On October 2, 2021, Judge McFadden sentenced her to two months of probation and a $3000 fine.

U.S. v. *Israel Tutrow, 1:21cr310*:  Mr. Tutrow, who has four prior criminal convictions and has previously served jail time, traveled from Indiana and unlawfully entered the Capitol with his friend and codefendant Joshua Wagner.[26] He admitted seeing officers engaging rioters and deploying tear gas on one side of the Capitol, so he went around and entered on the other side. He remained inside for about 30 minutes. When asked by the FBI whether he brought a weapon into the Capitol, he falsely stated three times that he did not. At his plea colloquy, he admitted that he did bring a knife inside. Tutrow turned himself in to the FBI when he was notified there was an arrest warrant for him and gave a voluntary — albeit flawed — post-arrest interview with the FBI. He deactivated his social-media accounts after January 6, but denied doing so because he feared the FBI would identify him. He did not engage in social-media promotion of his or others' breach of the Capitol. On December 21, 2021, he was sentenced by Judge Berman Jackson to 36 months of probation and $500 restitution

---

[25] *See* Statement of Offense, Case 1:21cr324 (ECF 24).

[26] *See* Government's Sentencing Memorandum, Case 1:21cr310 (ECF 43).

*U.S. v. Zachary Wilson & Kelsey Wilson, 1:21CR578.* The husband and wife defendants each plead guilty to Parading, Demonstrating or Picketing in a Capitol Building. Mr. Wilson entered the Capitol through a broken window while his wife entered through an adjacent door that had been forced open.[27]  The defendants "entered the Senate Wing doors, entered Nancy Pelosi's office, walked through the Rotunda, the Crypt, and various hallways before exiting."[28] They were in the building for 20 minutes. Neither engaged in violence or property destruction. Each defendant, however, engaged in aggravating conduct after they left. Mr. Wilson posted a message on his Facebook page that read ""first ones in !!!! First thing we found was Pelosi's office."[29] Unlike her husband, Mrs. Wilson did not celebrate the attack on social media, but when she was interviewed by the FBI, she intentionally lied by denying that she and her husband had entered the Capitol.[30] On January 27, 2022, Judge Mehta sentenced Mr. Wilson to 24 months of probation with 45 days home confinement, plus 60 hours of community service.  He sentenced Mrs. Wilson to 24 months of probation with 30 days of home confinement and 60 hours of community service.

*U.S. v. Stepakoff,* 1:21cr96.  Mr. Stepakoff entered the Capitol through a door that had been forcibly breached 12 minutes earlier.[31]  As he entered, people climbed through broken windows on either side of him. Stepakoff claimed not to notice.  He remained inside the building for 5 minutes and did not engage in violence or vandalism.  However, he posted videos and

---

[27] *See* Government's Sentencing Memorandum, Case 1:21-cr-578 (ECF 50).

[28] *See* Statement of Offense, Case 1:21-cr-578 (ECF 33).

[29] *Id.*

[30] *See* Government's Sentencing Memorandum, Case 1:21-cr-578 (ECF 50).

[31] *See* Government Sentencing Memorandum in Case 1:21cr96 (ECF 36).

messages on the internet about "storming the gates," about violence becoming "inevitable," and that "there comes a time when people just say we're not going to take it," though he claimed that he did not mean to support violence by the posts.  He later deleted his Facebook posts.  Mr. Stepakoff had no prior criminal convictions, but previously had his law license suspended for 6 months, in part, because he "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation." He was sentenced by this Court to 2 months home confinement with location monitoring and 12 months probation.

Of these six cases, each with offense facts similar or worse than Ms. Prado, all received non-incareration sentences.  Three received home-confinement as a condition of probation; the other three did not.

### CONCLUSION

For these reasons and any that shall be advanced at the sentencing hearing, counsel for Ms. Prado respectfully requests that this Court place Ms. Prado on supervised probation for 12 months, with the added conditions that she complete 60 hours of community service and pay $500 restitution.

Respectfully submitted,

_____/s/_____
Joan C. Robin
Virginia Bar No. 44502
Law Office of Joni C. Robin, PLLC
114 North Alfred Street
Alexandria, Virginia 22314
Ph: 703-349-1111
Fax: 571-279-6851
joni@jonirobinlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 31st day of January, 2022, I will electronically file the foregoing Motion to Continue with the Clerk of Court using the CM/ECF system, which will then send a notification of said filing (NEF) to counsel of record.

_____/s/_____
Joan Robin