**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00403 (RC)** |
| **v.** | : | |
| | : | |
| **NICOLE PRADO,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nicole Prado ("Prado") to 14 days in custody followed by a three year term of probation, 60 hours of community service, and $500 in restitution.[1]

**Introduction**

The defendant, Nicole Prado participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Prado pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because: (1) the defendant was aware of the potential for violence because

---

[1] Cognizant of remarks this Court has made in other cases indicating that the Court may be unlikely to impose imprisonment for non-violent offenders during the ongoing COVID pandemic, the government nonetheless recommends 14 days of incarceration because that sentence would satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

of her husband's concern that she was attending the January 6th rally alone when assaults had occurred at previous Pro-Trump events; (2) she entered the Capitol Building from the Upper West Terrace through doors that were initially breached by the mob only minutes earlier; (3) she took videos and photographs inside the Capitol, including one which she told FBI depicted a rioter spraying police with fire retardant inside the building; (4) she penetrated the U.S. Capitol all the way to inside the Office of the Ranking Member of the House Appropriations Committee on the third floor of the House, which she then entered; (5) she had to be evicted from the Capitol from the third floor by police; and (6) her husband filmed, then posted on social media, the two of them after she left the Capitol, commenting "Please meet the new Congresswoman…she was in the Capitol…She stormed the Capitol… She's the Speaker of the House."; (7) she deleted videos and photos taken inside the Capitol from her phone, including one which she told FBI showed a rioter spraying police with fire retardant. Prado did not reveal she had saved the files, nor did she provide them to the Government, until her interview done pursuant to the plea agreement 11 months after the riot.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. In this instance, the defendant believed the 2020 presidential election was fraudulent, so she attended the President's "Stop the Steal" rally on January 6, 2021 and joined the crowd walking to the Capitol after the speakers at the rally encouraged them to protest the election results. She knew they were not allowed to be so close to the Capitol building but continued to move forward.  She eventually entered the building from the Upper West Terrace door, which was alarmed to detect unauthorized entry.  She walked amid chants, flags waved, tear gas and the presence of officers at the door.   But

for her actions alongside so many others, the riot likely would have failed. *See United States v. Matthew* Mazzocco, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that succeeded in halting the Congressional certification and her presence in a restricted area shows a jail sentence is both necessary and appropriate in this case.

## I.     Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 33 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Nicole Prado's Role in the January 6, 2021, Attack on the Capitol

On January 6, 2021, Nicole Prado traveled by metro to Washington, D.C., from her home in Gaithersburg, Maryland to attend the "Stop the Steal" rally. She had attended other rallies supporting former President Trump and had signed up for emails from the "Stop the Steal" website. She received emails about the rally on January 6, 2021 and wanted to attend to protest what she believed was an unfair Presidential election and to take pictures for a photography class. She had been to other pro-Trump rallies.  She knew her husband was worried about her going to this "Stop the Steal" rally alone. He relayed to Prado that physical assaults had happened at similar pro Trump events.

Prado arrived at the rally and listened to speakers encouraging the crowd to go the Capitol to protest the election.  She walked with others to the Capitol, and observed people chanting, flags waving and saw tear gas in the air. She captured the signs and flags in pictures:



Once close to the Capitol, Prado took a picture of the crowd, with tear gas visible:



Prado stepped over a railing or stone barrier to get closer to the Capitol Building and she saw damaged scaffolding with people climbing on it:





Prado took pictures of the mob outside of the Upper West Terrace door one of which is shown below:



She was captured by United States Capitol Police surveillance video (CCTV) as she entered approximately 2:35 p.m., two minutes after the doors were breached at 2:33 p.m. by rioters from inside.



The door was alarmed and went off as the doors were breached. It is very likely the alarm was still blaring when Prado entered the Capitol building. *See* Gov't Exhibit 1 (Go Pro video taken by another January 6th rioter). As she walked in officers were at the inner door:



Prado went up to the Rotunda, where she took pictures, despite this sign of which she took

a picture:



Prado is depicted in Rotunda at approximately 2:37 to 2:40 p.m. in the screen shot below taken

from CCTV:

7



She then went into the atrium by the Old Senate Chamber, where she saw police in an altercation with rioters, who were trying to get through to the Senate side of the Capitol. Prado captured this photo below showing smoke inside the atrium, which likely reflects the fire retardant sprayed by rioters that she discussed with the FBI:



Instead of leaving, Prado reentered the Rotunda, with smoke from the atrium billowing from behind:



Below are screen shots from a video made by Keep in News Agency, a US-based French-language freelance service. This is in the same atrium that Prado walked through, after an irritant was deployed.  This screen shot depicts people at approximately 2:46 p.m. who had just left the hallway of the Old Senate Chamber after confronting police while trying to enter the Senate side of the Capitol:



Prado then entered the Statuary Hall Connector at approximately 2:40 p.m. with a mass of others, who eventually breached the police line in the House side of the Capitol, as shown below on a screen shot of CCTV:



With officers in riot gear trying to empty the corridors, Prado continued through the Capitol past the Rayburn Conference Room and Speaker's Lobby doors at approximately 2:44 p.m.  The crowd was chanting "this is our house" as recorded by Prado.  *See* Gov't Exhibit 2.



The Main Hallway by the Rayburn Conference room is depicted in CCTV as Prado walked past:



Prado then went to the third floor near the House Gallery:



Prado walked to the Office of the Ranking Member of the House Appropriations

Committee Room which is not open to the public.   A USCP officer reviewed the video and

provided a description that was shared with the defense.  Prado was near and inside the Committee room from about 2:45 p.m. to about 2:50 p.m. and was observed on CCTV leaving the room. Shortly thereafter, CCTV captured Prado with a group of rioters being herded by officers to remove them from the building.  Prado left the Capitol Building at approximately 2:52 p.m. from the South Door vestibule of the Capitol after being in the building about 20 minutes.

Prado herself captured the events on the first floor in one of the videos she had deleted from her telephone. That video shows an officer frantically asking the group, "Is there a shooter in the building?" and "If there is a shooter in the building, you know something about that, tell me."  The officer's words were voiced at almost the same time that a police officer shot Ashli Babbitt who was trying to enter the Speaker's Lobby Doors on floor below. In the same video, Prado captured the team transporting Babbitt, however the clip provided to the Court ends before that is depicted for sensitivity reasons.  *See* Gov't Exhibit 3.

Prado sent photographs to her husband taken inside the Capitol, some of which he posted on Instagram.  When he came to pick her up in Washington, D.C. later that day, he took a video of the two of them and posted it on Instagram.   In the video he says "Please meet the new Congresswoman…she uh, she just was in the Capitol for the first time today. She stormed the Capitol, she's the new Congresswoman. She's the Speaker of the House."  *See* Gov't Exhibit 4.

*Nicole Prado's Interview*

Prado was interviewed via Zoom by the FBI with her counsel present on December 14, 2021. During the interview, she stated she had gone to the "Stop the Steal rally to support the President and peacefully protest because she believed the 2020 presidential election was unfair. She also said she went to take photographs for a school project.  She traveled alone by Metro from her home in Gaithersburg, MD. She listened to the speech by the President and heard the

speakers encourage the crowd to walk to the Capitol to protest the Election results.  Prado went

with the crowd, where people were chanting and waving flags.  She did not think the crowd was

allowed to get too close to the Capitol building but she and the crowd did so anyway. She saw

smoke or tear gas as she got closer.  She went up the stairs and saw people climbing the

scaffolding.  She stepped over a stone barrier with the help of another rioter since it was quicker

than walking around it.  She saw guards in a group outside an open exterior door that people

were going through.  She went through as well after she saw the guards were not interacting with

the rioters and had turned their backs.

Prado admitted going to the Rotunda and taking pictures inside.  She then left and saw

people in the atrium trying to get into a closed doorway and being blocked by police.  Prado told

the FBI she recorded a video of this altercation during which she said she saw a rioter spray fire

extinguisher against the police.[2]  She then walked back into the Rotunda, coughing from either

the fire retardant or tear gas.  She then went up some stairs and walked down a hallway where a

crowd was trying to get through a set of double doors.  She then went into a small room with

large velvet chairs and windows where a man was drinking a beer he had taken out of the

refrigerator in that room. She told the FBI she may have also gone up to another floor and was

trying to go back down when someone told her "They have guns."  She saw people dressed in

black with guns and red lasers, so she went back up the stairs, where a lone police officer

directed them to leave the building.  The officer had them put their hands up and asked if anyone

had brought guns into the building. Prado said she didn't know if there were guns.  She recorded

this encounter.  She then left the building with the group as the officer directed them.

---

[2] No video of the incident was located by the Government on Prado's telephone nor on the thumb drive she provided.  A still photograph depicting smoke in the air was recovered, however.  This is likely what Prado was referring to in the interview with FBI.

Prado stated she recalled a police officer somewhere else in the building told a man not to go through a closed door and shoved the man.  About 20 minutes after she left the building, she saw a woman on a stretcher going by her location and saw blood on her. People around were upset and crying and said there had been a police shooting.

Prado's husband came to pick her up in Washington, D.C. She acknowledged her husband taking the "new speaker of the house" Video.  Prado admitted she sent her husband photographs she had taken from inside the building, which he posted on Instagram.  She deleted the photographs and videos she took inside the Capitol that evening but put them onto a USB drive, which she later gave to her attorney. She told the FBI she deleted them because she thought she might get in trouble and worried about being politically persecuted.

Prado admitted she knew politicians were inside the Capitol deliberating the certification of] the election results when she was inside and thought it would have been great if the politicians had interacted with the rioters.

*The Charges and Plea Agreement*

On June 3, 2021, Nicole Prado was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 11, 2021, Prado self-surrendered and made her first appearance in Washington, D.C.  On June 15, 2021, Prado was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 22, 2021, she pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(E), Parading, Demonstrating or Picketing in a Capitol building. By plea agreement, Prado agreed to pay $500 in restitution to the Architect of the Capitol.

## II.        Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. A term of probation of not more than 5 years may be imposed. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Prado admitted hearing chanting and seeing flags being waved, and to climbing over a barrier to get closer to the building. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. Prado admitted to seeing smoke or tear gas in the air outside, and to seeing officers at the door where she entered, both inside and outside the Capitol. She also saw smoke or tear gas inside the building. She also observed officers in altercations with rioters inside and heard chants of "this is our house" from rioters near the Speaker's Lobby.  No rioter was a mere tourist that day.

Additionally, while looking at Prado's individual conduct, this Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Prado personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on ~~the~~ Prado's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Prado from most other misdemeanor defendants.  Prado's lack of violence and property destruction explains why she was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Finally, Prado attempted to prevent investigators from uncovering evidence of her participation of the riot. The FBI was unable to locate Exhibits 2-4 on Prado's phone when it was seized. In fact, there were no photographs or videos from inside the building on her phone. FBI identified a gap in the time sequence between photos taken before Prado went inside and photos taken after she left the Capitol building on January 6. Prado did admit to deleting them in her debriefing.  She turned those missing photos and videos over in December of 2021, six months after her arrest. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Prado's History and Characteristics.

As set forth in the PSR, Prado's criminal history consists of a misdemeanor conviction for DUI and driving with a suspended license. ECF 38 ¶¶ 25-26. Prado is presently employed by her husband's business as an account manager. ECF 38 ¶ 54. She has been compliant while on release. ECF 38 ¶ 10.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). In this case, Prado destroyed evidence and entered a room restricted to only members of Congress.  A sentence of incarceration is thus appropriate.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

[D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Nicole Prado's actions on January 6, 2021, including her deletion of evidence from her telephone, and her participation in the video posted on social media in which her husband narrated with "she stormed the Capitol" and "meet the new Speaker of the House" demonstrate the need for specific deterrence for this defendant.  Prado climbed over a barrier to get the Capitol building after acknowledging in her interview with FBI that she did not think the crowd was supposed to be there.  Even after entering and seeing two different confrontations with rioters and police, she continued in her path through the workplace of Congress.  She admitted she knew Congress was certifying the election that day and yet she made her way up to the third floor and a room closed to the public.

While the Government is aware of this Court's concerns about sentencing non-violent offenders to incarceration during Covid, we respectfully maintain that incarceration is appropriate in cases with similar actions as this one.   Prado's actions underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not become the default.[5] *United States v. Anna Morgan-Lloyd*, 1:21-

---

[4]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be." (statement of Judge Lamberth at sentencing).

The government and the sentencing courts are making meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Prado has pleaded guilty to Count Four of the Superseding Information, charging her with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(D). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir.

2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as co-defendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases.

In ***United States v. Leonard Gruppo***, 21-CR-391(BAH), the defendant was a 28-year army veteran who entered for a short time (6 minutes) and who ignored the commands of law enforcement. Like Prado, he destroyed his photos/videos and scaled a small wall on the way into the Capitol. Gruppo had ignored law enforcement commands during the riot, whereas Prado obeyed the officer when he herded the rioters from the third floor. Gruppo received a sentence of 24 months' probation, 90 days of home detention, a $3,000 fine, $500 restitution, and a location monitoring condition.

In ***United States v. Tam Pham,*** 21-CR-109 (TJK) the defendant, an active-duty Houston, Texas police officer, entered the Capitol building for about 20 minutes and went into an office space.  Like Prado, who entered the private Office of the Ranking Member of the House Appropriations Committee, Pham deleted photos from his phone. He received a sentence of 45 days incarceration.

In ***United States v. Andrew Ericson***, 21-CR 506 (TNM), Ericson Defendant was inside for about 15 minutes but entered the House Speaker's conference room on the second floor, posted a photo of himself with his feet on the conference table and took a beer from the refrigerator. Like Prado, he saw officers overrun by a crowd of rioters and posted on Snapchat while cheering on criminal activity.  Judge McFadden imposed 24 months of probation with 20 days incarceration, on consecutive weekends.  The Government had recommended 60 days incarceration.

In ***United States v. Nichols Perretta***, 21-CR-539 (TSC). Perratta went inside for 15-30 minutes after seeing an assault of an officer (although it was outside) nevertheless went in for 15-30 minutes, went to the third floor, like Prado. Also, like Prado, he communicated what he had done that day with a text saying "We broke into the capital." And like Prado, he may have entered close in time to a breach. Perratta received a sentence of 30 days' incarceration.

In ***United States v. Felipe Marquez,*** 21-CR-1316 (RC), your Honor imposed a sentence of 18 months' probation with 3 months of home confinement for an A misdemeanor plea. The Government recommended incarceration.  Marquez filmed the events of January 6th from inside the building including inside Senator Jeff Merkley's hideaway office, and then posted it online. Prado's accomplishment of "storming the capitol" was posted on Instagram, and like Prado, Marquez went into a sensitive space in the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.  **Combining Incarceration and Probation**

The sentence requested by the government—14 days of incarceration followed by a term of three years of probation—is a lawful one. A sentencing court may impose a "split sentence"— "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

> *a.  **A sentence imposed for a petty offense may include both incarceration and probation.***

i. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

## ii.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at

808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

29

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of

determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Prado pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

    ***b.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

        i.  <u>Relevant Background</u>

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[8]

ii.   Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[9] Such a sentence would be appropriate for Prado here.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence of 14 days in custody followed by three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future

---

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

crime by imposing restrictions on her liberty because of her behavior, while recognizing her early

acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/Mona Lee M. Furst
         MONA LEE M. FURST
         Kansas Bar No. 13162
         Assistant United States Attorney
         Federal Major Crimes-Detailee
         U.S. Attorney's Office
         555 4th Street, N.W., Room 5840
         Washington, D.C.  20530
         Office: 316-269-6537
         Mona.Furst@usdoj.gov