1

2

3          **UNITED STATES DISTRICT COURT**
            **FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,        ) Criminal Action
                                 ) No. 1:21-cr-00403-RC
              Plaintiff,         )
                                 ) **Sentencing** (via Zoom)
vs.                              )
                                 )
Nicole Prado,                    ) Washington, D.C.
                                 ) **February 7, 2022**
              Defendant.         ) Time:  11:00 a.m.
_____

          **Transcript of Sentencing** (via Zoom)
                    **Held Before**
        **The Honorable Rudolph Contreras** (via Zoom)
                **United States District Judge**


                 A P P E A R A N C E S

For the Government:      **Mona Furst**
(via Zoom)              DEPARTMENT OF JUSTICE
                       UNITED STATES ATTORNEY'S OFFICE
                       301 North Main, Suite 1200
                       Wichita, Kansas 67052

For the Defendant:      **Joan C. Robin**
(via Zoom)              LAW OFFICE OF JONI C. ROBIN
                       114 North Alfred Street
                       Alexandria, Virginia 22314

Also Present:           Robert Walters, Probation Officer
_____

Stenographic Official Court Reporter:
(via Zoom)              Nancy J. Meyer
                       Registered Diplomate Reporter
                       Certified Realtime Reporter
                       333 Constitution Avenue, Northwest
                       Washington, D.C. 20001
                       202-354-3118

1              P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3       limitations of technology associated with the use of
technology, including but not limited to telephone and video
4       signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5       reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  This is Criminal Action

8       21-403, United States v. Nicole Prado.

9              For the United States, I have Mona Furst.  For Nicole

10      Prado, I have Joan Robin.  Our probation officer is Robert

11      Walters; and, again, our court reporter is Nancy Meyer.

12             All parties are present.

13             THE COURT:  Good morning, everybody.  Are we ready to

14      get started?

15             MS. FURST:  Your Honor, this is Mona Furst.  The

16      government is ready.

17             MS. ROBIN:  Good morning, Your Honor.  Joni Robin on

18      behalf of Ms. Prado, who is present and on the screen.  We are

19      ready as well.

20             THE COURT:  Let's start with the CARES Act colloquy.

21      The Chief Judge in this district has authorized the use of

22      videoconferencing for sentencings because it cannot be

23      conducted in person without seriously jeopardizing public

24      health and safety.  We're prepared to proceed by

25      videoconferencing for this hearing.

1        Do the parties believe that proceeding today via

2    videoconference rather than waiting until a hearing can be

3    safely held in person is in the interests of justice?

4    Ms. Robin?

5            MS. ROBIN:  Yes, Your Honor.  On behalf of Ms. Prado,

6    we do.

7            THE COURT:  Okay.  Can you make a little bit of a

8    record as to why it's preferable to proceed today rather than

9    waiting until the unforeseen day in which COVID is gone and

10   people can safely appear in person again?

11           MS. ROBIN:  Well, Your Honor, Ms. Prado lives in

12   Florida with her two young children, who are ages 2 and

13   6 months; and currently, while we are, I think, on the tail end

14   of a COVID surge, we are, nevertheless, not fully recovered

15   from the Omicron surge.  And given the number of variants that

16   have been coming out -- and there's also talk about another

17   variant related to the Omicron's variant -- it seems like we

18   could be waiting forever.  Ms. Prado's anxious to have this

19   sentencing happen and move on with her life.

20           THE COURT:  Ms. Furst, do you have a contrary view?

21           MS. FURST:  No, Your Honor.  I concur.

22           THE COURT:  Okay.  Ms. Prado, do you agree, after

23   having consulted with your counsel, to participate in today's

24   sentencing hearing using videoconference rather than being

25   physically present in the courtroom?

1          THE DEFENDANT:  Good morning, Your Honor.  And that's

2     correct.

3          THE COURT:  Okay.  And are you comfortable with the

4     videoconferencing equipment made available to you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  And do you have a way in which you

7     can communicate privately with your attorney during this

8     hearing, if necessary?

9          THE DEFENDANT:  Yes, Your Honor.  I have my phone

10     beside me, in case.

11          THE COURT:  Okay.  And this Zoom technology also has

12     an ability where if you want to speak to your counsel

13     privately, you can ask the courtroom deputy to do that.  And we

14     can put you in a separate virtual conference room where just

15     you and your attorney are present and no one else can hear or

16     see what goes on in that breakout room.  So if you need to do

17     that, by all means ask.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  The Court finds that the use of the VTC

20     is necessary because it is not practical to appear in person

21     and proceeding by VTC today is justified because the interests

22     of justice will be harmed without a prompt hearing; and the

23     defendant, after consultation with counsel, has consented to

24     proceeding in this fashion.

25          So let's start -- or let's move on now to the joint

1    motion to correct the statement of offense that's in the

2    docket, ECF No. 37.

3           Ms. Furst, you're in agreement with that?  That was a

4    joint motion?

5           MS. FURST:  It is, Your Honor.  As I got more into

6    the weeds, I realized that the time frame was not quite as

7    broad as I originally thought.  So I am in agreement.

8           THE COURT:  And, obviously, Ms. Robin you are as

9    well; right?

10          MS. ROBIN:  Yes, Your Honor.

11          THE COURT:  I'm going to grant that motion to correct

12   the statement of offense, and Exhibit 1 to that motion will

13   become the operative statement of facts.

14          All right.  Ms. Prado and defense counsel, have you

15   reviewed the presentence report as revised following the

16   defense and the government's submissions?

17          MS. ROBIN:  Yes, we have, Your Honor.

18          THE COURT:  Okay.  And any additional objections?

19          MS. ROBIN:  No additional objections.  I have one

20   very brief correction and just one, I guess, update.  But very

21   brief.

22          The first is to paragraph 47.  Just wanted to -- that

23   references -- Ms. Prado had indicated the name of a provider

24   that she was going to be seeking treatment from related to her

25   postpartum depression symptoms.  Since the interview, she has

1  had three appointments with that particular provider that's

2  been named --

3          THE COURT:  Ms. Prado, we had a -- or at least --

4          MS. ROBIN:  I wanted to make that update.

5          THE COURT:  Your audio, at least for me, broke up a

6  little bit.  Can you start again after since the -- since the

7  interview.

8          MS. ROBIN:  Certainly.  Since the interview, I'm

9  saying -- I'm getting a message -- sorry -- saying that my

10 connection is unstable.  Are you able to hear me okay?

11         THE COURT:  So far, yeah, but occasionally it goes

12 out a little bit, as well as the video kind of freezes a little

13 bit.

14         MS. ROBIN:  Okay.  In the meantime --

15         THE COURT REPORTER:  Ms. Robin, let me --

16         MS. ROBIN:  Yes.

17         THE COURT REPORTER:  Judge, should she perhaps call

18 in on the public line?  Leave her video up muted, but then call

19 in on the audio line.

20         THE COURT:  I don't know.  Has that been working

21 better?

22         THE COURT REPORTER:  I feel it has, yes, but Tanya

23 may have some insight also.

24         THE COURTROOM DEPUTY:  It has.

25         THE COURT:  Okay.

```
 1                    THE COURTROOM DEPUTY:  Ms. Robin, there is a

 2     telephone number in the invitation.  Once you join that

 3     telephone number --

 4                    MS. ROBIN:  Okay.

 5                    THE COURTROOM DEPUTY:  -- you can use the meeting

 6     code and hit pound.

 7                    MS. ROBIN:  In the meantime, I'm seeing if I can

 8     access through a hardwire on my desktop.

 9              Okay.  I see a phone number for -- oh, I think I'm -- I

10     think I might be able to -- I'm connecting now through my

11     hardwired computer.  So that might be a better option.

12                    THE COURTROOM DEPUTY:  Okay.  We have you now.

13                    MS. ROBIN:  I'm going to log off of the other one.

14                    THE COURTROOM DEPUTY:  Okay.

15                    MS. ROBIN:  I apologize.  Are you able to hear me

16     now, Your Honor?  Your Honor, are you able to hear me now?

17                    THE COURT:  Yes, yes.  It sounds great.

18                    MS. ROBIN:  Okay.  Wonderful.  Sorry about that.

19              I -- where I was -- what I was saying is that with

20     respect to -- to paragraph 47, since Ms. Prado had the PSR

21     interview, she has had three appointments with that particular

22     provider.  So I just wanted to update that with respect to the

23     PSR.

24              And then the second point is paragraph 51 indicates that

25     she received her degree in finance and graphic design.  That
```

1    should be fine arts and graphic design.

2             THE COURT:  I wondered that, given the school, but

3    thank you for the correction.

4             MS. ROBIN:  That's all.  Thank you, Your Honor.

5             THE COURT:  All right.  So the Court will accept the

6    presentence report as its findings of fact on issues not in

7    dispute.

8             Defendant has pleaded guilty to a Class B misdemeanor to

9    which the sentencing guidelines do not apply.  Therefore, I

10   will assess and determine the proper sentence in this case by

11   reference to and consideration of all the relevant factors

12   pursuant to the sentencing statute at 18 U.S.C. 3553(a).

13            Defendant pled guilty to Count 4, parading,

14   demonstrating, or picketing in a Capitol Building in violation

15   of 40 U.S.C. § 5104(e)(2)(G).  The defendant has no significant

16   criminal history.  There's a DWI there and a driving on a

17   suspended license.  The maximum term of imprisonment for this

18   offense is six months, and the maximum fine is $5,000.

19            Would the government like to address the Court regarding

20   sentencing?

21            MS. FURST:  I would, Your Honor.  Thank you.

22            As the Court knows, the events of January 6th, 2021,

23   will forever be burned in our collective minds.  A crowd that

24   was watching their President at a rally to protest the

25   2020 presidential election turned into an angry violent mob by

1  the time the rioters made it to the Capitol Grounds.

2  Vice President Pence was inside under Secret Service

3  protection, and Congress was in session to certify the

4  presidential election results.

5       The people at the Capitol that day were upset about that

6  election, and many believed that it had been fraught with fraud

7  and that such fraud needed to be addressed with their members

8  of Congress.  But what the mob did was address Congress causing

9  tear gas to be deployed, alarms on sealed doors to be

10  activated, damage to property, and injury and death to those

11  there.

12       The defendant voluntarily chose to attend the rally, and

13  the rally was called Stop the Steal.  And the speakers had

14  encouraged the crowd to go to the Capitol and stop the

15  certification of the presidential election.  As the Court of

16  Appeals recounted in *Trump v. Thompson*, decided December 9th of

17  2021, vice president -- I'm sorry -- President Trump -- former

18  President Trump told the crowd to -- in which the defendant was

19  listening -- that the election was rigged and stolen and that

20  we were going to walk down Pennsylvania Avenue to the Capitol

21  and were going to try and give our Republicans the kind of

22  pride and boldness they need to take back our country.  And the

23  President at that time warned, "You'll never take back our

24  country with weakness."  "We fight like hell."  "And if you

25  don't fight like hell, you're not going to have a country

1    anymore."  Now, as the defendant walked to the Capitol, there

2    were chants of "Stop the Steal" all around her.

3           Importantly, she told the FBI that she actually

4    anticipated violence that day and knew it was a possibility,

5    and this was because her husband had expressed concern about

6    her going alone when he knew there had been violence at other

7    such events.  She willingly went to the Capitol, even though

8    she told the FBI she thought they weren't supposed to go up on

9    the grounds.  And when she arrived, she took a picture of tear

10   gas in the air, but she continued to go forward.  She entered

11   the building, and she entered the office of the ranking member

12   of the House Appropriations Committee.

13          The damage to the Capitol was all around her,

14   Your Honor.  There were fallen and broken barriers, bike racks,

15   torn scaffolding.  As rioters climbed to the upper areas, the

16   defendant herself took pictures of people climbing on the

17   scaffolding, as well as, as I said, pictures of the tear gas

18   that was in the air.

19          Once she got inside, she saw, as she told the FBI,

20   rioters were spraying fire retardant on officers inside the

21   building.  And she documented an officer on the first floor as

22   she was leaving who was excitant and frightened, asking if

23   there was a shooter in the building.

24          And all this material that was from the inside of the

25   building, Your Honor, she removed from her phone.  When the

1     agent went through the phone, pursuant to a search warrant,

2     there was a missing gap of the time that she was inside the

3     building.  She removed, as she told the FBI, that material the

4     evening of January 6th because she was concerned that she

5     shouldn't have it on her phone.  And yet when we obtained the

6     phone from counsel, there was no mention of anything that had

7     been removed.  We did not learn about that material until we

8     did the proffer pursuant to the plea agreement.

9        And Ms. Robin has said in her reply, well, we never

10    asked for it.  But, Your Honor, you can't ask for something you

11    don't know existed.  As far as the government was concerned,

12    that material had been deleted and destroyed.

13        There was no evidence of a peace- -- peaceful

14    demonstration that day on January 6th.  The area where this

15    defendant walked in, the upper west terrace doors, Your Honor,

16    she had to pass by the southwest [sic] wing doors.  And those

17    doors had been breached twice, at 2:12 and then again about

18    2:45.  There was a large crowd there trying to get in at the

19    time she would have been up at the upper west terrace.  And the

20    Senate wing doors are just a few yards from where she entered

21    the building.

22        Now, the defendant has said that the door was open,

23    officers were standing there, people were going in trying to

24    shake the officers' hands.  She herself said thank you as she

25    entered.  Your Honor, just because the door was open doesn't

1   mean it was lawful to enter, and just because she said thank

2   you doesn't mean the officers were giving her permission to go

3   in the building.

4        That building had been closed since March of 2020.  That

5   building was closed that day because of the certification of

6   the election.  It was all around.  Nobody went through --

7   nobody went through metal detectors.  They just poured in.  It

8   is -- it's like you watch a jewelry store being broken into and

9   just after the robbers leave, you walk in and take some things

10  as well.  Just because you didn't break the doors down doesn't

11  mean you're not just as guilty.

12       And in this particular situation, as Your Honor knows,

13  the police were overwhelmed.  There were hundreds of people in

14  the building that day, possibly even a thousand, and these

15  officers were outnumbered at least four to one.  In every area

16  where the doors were breached, they were trying to hold back

17  the mob, and they couldn't do it.  And so it's not unreasonable

18  for them to have decided to step aside and perhaps go somewhere

19  else to see if they can help them.  Just because they're

20  standing there shaken, surprised, doesn't mean it was okay to

21  go in.

22       The defendant and hundreds of others at the Capitol that

23  day formed a collective that tried to bring down the government

24  from within.  This particular defendant did not commit any

25  violence, but her presence there, along with the hundreds of

1    other people that were there from all over the country, this

2    was the hive mind acting together.  Their presence, presence in

3    numbers, allowed the people who did commit violence, who did

4    break into doors, who did break into windows, allowed them to

5    do that because they had strength in numbers.

6         Now, Your Honor, the thing that's very telling about

7    Ms. Prado in this situation, she went in, as we said in the

8    amended statement of the offense, about 17 minutes.  She went

9    in the upper west doors.  Those doors are alarmed.  And in -- I

10   think it's Exhibit 1 that I submitted to the Court, this is an

11   exhibit that was taken by another January 6th defendant shortly

12   before she would have entered.  This was at the time when the

13   doors were opened by rioters from the inside.  You can hear the

14   alarm in that exhibit, and that exhibit goes about a minute and

15   45 seconds.

16        And Ms. Prado would have come in shortly thereafter,

17   Your Honor.  She would have heard that alarm.  And the officers

18   standing at the door -- as indicated in the still shots that

19   both the government and the defense have provided -- what can

20   they do?  They're overcome.  People are pouring in, and there's

21   two of them standing at the door from what we can tell.

22        Now, Your Honor, I -- I will note that she also went to

23   the second floor and she also went to the third floor.  And

24   that is where the appropriations office is located, and that

25   door is marked with appropriations at the top of it,

1  Your Honor, and that is the office for the ranking member of

2  the House Appropriations Committee.  And she went inside for a

3  period of minutes.  She admitted she went inside.  She saw

4  other people in there.  She saw a man take a beer out of a

5  refrigerator and then decided it was time to leave.

6        And she went back out.  There are officers at this point

7  on the third floor with weapons.  And this is about 2:50,

8  Your Honor.  The shooting of Ashli Babbitt had happened minutes

9  before.  So there's officers with weapons all over the

10  building.  They direct her downstairs.  On the second floor,

11  she's directed to the first floor, and it's on the first floor

12  where she encounters the officer who's frantically saying, "Do

13  you know anything about a shooter?"  And then she and the

14  others are -- are told to go outside.  And she went outside.

15        Your Honor, I tried to compare her actions with similar

16  defendants in January 6th cases who went into sensitive spaces,

17  such as Officer [sic] Merkley's room or the Senate lounge area.

18  This is why we are recommending a term of 14 days'

19  incarceration, followed by 3 years of probation, and a

20  $500 restitution, with 60 hours of community service, and the

21  $10 special assessment.

22        I truly believe, Your Honor, that this defendant, as

23  indicated in the presentence report, could benefit after

24  incarceration from a continued term of supervision, but I

25  believe that she deserves the incarceration for her actions

1    that day, her knowledge that day, and her continuous -- her

2    continuous route in the building, even seeing officers being

3    attacked in the building and -- and remaining in the building

4    and then going into the House member's appropriation room.

5         Your Honor, I would also like to address -- the defense

6    had mentioned some cases in their memo.  *Eliel Rosa* case, this

7    individual pled pretty early on, Your Honor, and he did not go

8    into a sensitive space, nor did he destroy any evidence.

9         The *Danielle Doyle* case, she also pled early.  I think

10   she was, like, in the first dozen to plead.  She tried to rush

11   in, and law enforcement stopped her, and she fell at the

12   threshold.  She did have some bad texts before and after and

13   talked about the violence, but she's really not someone to

14   compare Ms. Prado to.

15        The *Tutrow* case, Your Honor, that situation -- we had

16   recommended 60 days of incarceration.  The court there found

17   that that particular defendant was on a good course towards

18   mental health counseling and wanted to have the defendant stay

19   on that mental health counseling and so determined that

20   probation for that particular defendant, who carried a knife

21   and lied to the FBI, was important for the mental health

22   component.

23        And then in the Zachary and Kelsey Wilson case, we had

24   recommended the same sentence that we recommended here,

25   14 days' incarceration.  The judge determined that probation

1   was more appropriate based mostly upon life hurdles that one of

2   the individuals had overcome.  They did go into the Speaker's

3   suite.  And they also had young children.  However, in this

4   case, Ms. Prado has a husband who has told probation that if

5   she is incarcerated, he will be able to take care of the

6   children.

7        And then, lastly, the *Stepakoff* case, which Your Honor

8   had before you.  And as you know, this is the attorney who

9   became a rabbi, and he did post a lot of bad stuff on social

10  media.  We -- we did recommend incarceration, and Your Honor

11  gave him probation and a fine.

12       Now, Your Honor, I do recognize your position that it

13  doesn't make sense to incarcerate nonviolent misdemeanants like

14  this individual with the concern with COVID.  But, Your Honor,

15  there are college dorms.  There are senior citizen homes.

16  There are group settings, including jails all over the country,

17  that have been dealing with the coronavirus for two years.  And

18  agencies have not stopped arresting people, and courts have not

19  stopped putting people in jail.  There are things in place --

20  distancing, masking -- both for vaccinated and unvaccinated

21  people, and I would just urge the Court to consider all the

22  facts in this case and follow the government's recommendations.

23       Thank you, Your Honor.

24        THE COURT:  All right.  Thank you.

25       Ms. Robin.

1          MS. ROBIN:   Thank you, Your Honor.

2          Your Honor, as I indicated, Ms. Prado is 30 years old, a

3     mother of two young children, one of whom is still nursing.

4     She has no history of violence.  And as we know, she didn't

5     engage in violence that day nor property destruction nor theft

6     of property, and she didn't encourage anyone else to do so.  In

7     fact, she didn't chant or cheer.  She was virtually silent, not

8     engaging with the crowd, until the very end.

9          When police approached her, she complied with their

10    directions and, in fact, instructed another demonstrator -- or

11    admonished another demonstrator to comply with police

12    instructions as well.  That was the extent of her interacting

13    with the crowd.

14         Apart from that, she was silent.  And we know this --

15    it's corroborated by the fact of the CCT- -- CCTV video

16    footage, which the defense in this case provided to the

17    Court, which I think is very, very telling.  In nearly -- I

18    don't know.  There are eight or nine videos of -- of

19    Ms. Prado, and in none of them is she doing anything other than

20    walking around, occasionally looking around, and taking

21    photographs, carrying her small handheld flag, not interacting

22    with anyone.

23         I know, certainly, that we cannot devoid this case from

24    the background of January 6th, but it is important, as the

25    government acknowledges, I think, to put everyone on a spectrum

1    and their behavior on a spectrum.  And while I don't --

2    certainly it's up to the Court to decide which factors matter

3    most to it, I do think that their test actually corroborates

4    and supports our argument that a probationary sentence without

5    home confinement is the most appropriate.

6         Before I get into that, I do want to mention a couple of

7    things and just correct -- or clarify a couple of points that

8    the government has made.  The government says that Ms. Prado

9    went there anticipating violence; that she told police in her

10   interview that she knew that other rallies had been violent.

11   That's not entirely -- that's a little bit misleading.  Because

12   what she told police was not that she anticipated any violence

13   with police, but that other -- at other -- at another rally she

14   had seen counterprotesters engage with protesters, not violence

15   upon police, though.  And I think that's kind of a significant

16   distinction, and the reason why she brought that up was because

17   of concerns her husband had about her own safety and whether or

18   not she would be safe protesting.

19        All along, she has been quite adamant that her -- her

20   intent was to peacefully protest, and that's corroborated by

21   the CCTV video footage.  She did nothing to antagonize police

22   at all that day or subsequent thereto; and, again, we know that

23   because she had two encounters that day, the first as soon as

24   she entered, where she thanked the officer.

25        We point that out not to say that it was -- she thinks

1    it was okay, not to suggest that that's some sort of a legal

2    defense.  It's not.  She understands that, and that's why she

3    pled guilty.  But it does certainly distinguish her case from

4    cases where there are just throngs of protesters literally

5    pushing past police or entering in through broken doorways or

6    entering in through broken windows where there's violence

7    evident.

8         You can see from the CCTV footage of her entry; it was

9    quite different than in a number of those situations.  There

10   weren't hundreds of people pouring in.  At the time she

11   entered, there was probably about eight or nine protesters

12   walking in the hallway in towards the inner doors.  She was the

13   last of -- she was actually towards the very end.  And there

14   weren't just two officers at the door.  There were about four.

15   And you can tell that because the video shows within seconds

16   after her entering that second enter of doors, you see officers

17   walking out.  And even as they walk out, they're not attempting

18   to stop the protesters for walking in.

19        I don't point that out to disparage the officers.  They

20   had an impossible job that day.  But I do point it out because

21   I think it's relevant to Ms. Prado's intent.  Obviously, you

22   know, if she was encountering officers telling her actively to

23   leave or, you know, trying to press the crowd back, that's a

24   very different mindset than what Ms. Prado had that day.  So

25   her mindset, I think, is -- is very much consistent with what

1    she did, which is she thanked the officer, much as the

2    protester in front of her thanked him and went to shake his

3    hand as well.  So that was her mindset when she walked in.

4         When she -- and I think that kind of transitions into

5    the government's first prong:  whether, when, and how they

6    entered the Capitol.

7         In terms of the second prong, whether or not the

8    defendant encouraged violence, we know that she didn't.  We

9    know that she didn't encourage violence or property

10   destruction.  There was -- there was a limited instance where

11   she observed violence, direct, immediate violence, and that's

12   the area that she documented -- she gave the photograph to

13   police -- where she saw an individual from all the way across

14   the room.  So she wasn't close to the individual, but she saw

15   him from all the way across the room.  She took a photo of the

16   individual dispersing a fire hydrant in the air.  You can see

17   from the photo, it's obvious that it's several feet away from

18   the officer.

19             THE COURT:  Fire extinguisher?

20             MS. ROBIN:  Yes, fire extinguisher.

21        And, as I said, you can see from the photo that it's

22   several feet away from the officer.  But it is something she

23   documented.

24        And then let's talk about what she did thereafter.  She

25   immediately left that area.  Any time that she observed

1    something that was clearly criminal in her mind, you know, like

2    such as direct contact with police, she immediately exited the

3    area.  And she went back into the rotunda, which is where she

4    had come from.  And as I said, she has provided that photograph

5    to -- to the prosecution.  Whether or not that assisted them

6    with the prosecution of another, I don't know, but she's

7    provided to them all of the photographs.

8         So -- and I'll get to that point in a moment.  But with

9    respect to the third prong, she certainly didn't encourage

10   property destruction either.  And, in fact, this is the second

11   interaction, if you want to call it that, that she observed

12   someone drinking a beer in -- in one of the secured areas.  She

13   was uncomfortable enough with it -- she didn't actually observe

14   him take it from the refrigerator.  That was a misstatement,

15   but she did observe him drinking it.  And it was -- made her

16   uncomfortable enough that she actually asked the individual,

17   "Where did you get that from?"  And when he said he got it from

18   a refrigerator in the office, she left.  She was uncomfortable

19   with that and she left.

20        So -- so that's her reaction to other protesters

21   engaging in either petty theft or direct violence with police.

22   Her reaction was to remove herself.  Should she have taken it

23   further?  Yes.  She should have left the building entirely, but

24   she certainly wasn't actively encouraging the violence, and she

25   would immediately remove herself in the two situations that she

1   observed conduct rising to the level of obvious criminality.

2          Your Honor, moving onto the next prong, it talks about

3   whether or not the defendant destroyed evidence.  And here, I

4   guess, we'll just have to agree to disagree, because I don't --

5   I don't know the situation where the government has claimed

6   when someone intentionally preserves evidence, that that was

7   actually destroying it.  The only reason why they have those

8   photos is because she didn't destroy it.  They didn't charge

9   her for six months.  If she wanted to destroy evidence, get rid

10  of it, she had plenty of opportunity to do so.  She didn't.

11         She moved some photos off of her phone.  Every single

12  photo she moved off of it, she saved onto a thumb drive.  When

13  she was contacted by the FBI six months after the fact about

14  the fact that she had a warrant, she immediately arranged

15  through counsel to turn herself in.

16         And then she also saved them significant time and

17  expense of having to execute search warrants.  Admittedly, the

18  FBI told her they had search warrants that they could execute

19  if they wanted to; it would be easier on everyone involved if

20  she -- if she wanted to voluntarily provide the information

21  they were seeking.  Of course, she was happy to do so.  They

22  provided us with a list of what they were looking for.  They

23  wanted all of these items that she was wearing.  She provided

24  that.  They wanted her phone.  Had they asked for every

25  photograph she took that day, then certainly that would have

1    been provided.  Because when she gave me her phone, she also

2    gave me the thumb drive, but as counsel, my job, quite frankly,

3    is not to anticipate the needs or the investigation of law

4    enforcement.  It's to comply with -- with the request.

5           THE COURT:  But she didn't disclose that she had

6    moved the pictures from the phone to the thumb drive at the

7    first interview, did she?

8           MS. ROBIN:  She did -- she disclosed that at the very

9    first interview, absolutely.  The first interview they had with

10   her was post-plea, and she disclosed it.  That's how they --

11   that's how she -- they asked immediately for those photographs,

12   and I provided them.

13          THE COURT:  So the FBI did not interview her prior --

14   right around the time of the events?

15          MS. ROBIN:  No.  Only to the extent that they asked

16   her inside the building, "Are you aware of whether or not

17   there's an active shooter in the building?"  And -- because

18   that must have been the around time that the officer had shot

19   Ashli Babbitt, is my guess.

20          THE COURT:  So the only -- the only time the FBI

21   interviewed her was as part of the requirement of the plea?

22          MS. ROBIN:  That's correct.  That's correct.

23          THE COURT:  Okay.

24          MS. ROBIN:  And she -- and she admitted and

25   acknowledged at that time that she did have photos that she

1      transferred to the thumb drive; that -- you know, and that she

2      had actually provided them to me at the same time she provided

3      me her cell phone.

4           And, quite frankly, I -- I remember specifically having

5      a conversation with a colleague about, well, the government

6      asked for the phone.  They haven't asked for all the

7      photographs.  You know, what sort of ethical obligation do I

8      have?  And I determined that my ethical obligation, you know,

9      pre any sort of plea offer, pre -- you know, not knowing

10     whether or not any plea offer would be made, certainly was to

11     appropriately, not -- zealously represent my client and

12     disclose what they asked for, certainly, but not act as an

13     investigator on their team.  And, quite frankly, I -- I think

14     that was the appropriate choice.  I think the rules of ethics

15     for a defense attorney would require that.

16          So -- Ms. Prado, though, she did nothing wrong.  She did

17     everything you would want a client to do.  And so when she gave

18     me the thumb drive, I kept it in a secure location, knowing

19     that if and when the government would ask for it, that we would

20     provide it.  But they hadn't asked for it at that point.  The

21     moment they asked for it, it was provided.

22          So certainly there's -- there was no destruction of

23     evidence, and not even an attempt to destroy the evidence

24     because she had -- if she attempted -- really intended to do

25     so, they wouldn't have half of the photographs that they

1   included in their memo.

2           THE COURT:  But isn't it sort of the same as -- if

3   someone knows the FBI is going to execute a search warrant on

4   their house and takes a box of files and puts it in the trunk

5   of their car and then stays silent, isn't that sort of the

6   same?

7           MS. ROBIN:  They didn't get the photos from her

8   phone.  That's important.  They -- the -- the photos --

9   sometimes you can retrieve deleted images.  That's -- that's

10  not where they got from them.  They had been -- you know,

11  transferred so long ago that --

12          THE COURT:  I know.  But the thumb drive they didn't

13  get until after the plea; is that right?

14          MS. ROBIN:  That's right.  And I -- my response to

15  that would be, the only way that they would have known about

16  the thumb drive would be if she had made statements.  She's

17  protected by the Fifth Amendment, and it can't be used against

18  her that she didn't volunteer those statements.  She wasn't

19  interviewed prior to the fact.  So -- and, quite frankly, had

20  she been interviewed, she would have disclosed it.

21          So to the extent, I think, the government wants to hold

22  anyone culpable, hold me culpable for not disclosing it to the

23  government because they didn't ask for it.  And, quite frankly,

24  I -- I -- I think if I had done the reverse, it would have

25  arguably have been a violation of my rules of, you know,

1     zealousness to my client at that early point in time when I

2     hadn't seen any discovery and hadn't -- certainly no plea offer

3     had been extended.

4          So, you know, I -- I actually don't agree at all that

5     that should be held against Ms. Prado.  She did everything you

6     would want someone in that circumstance to do.  And she was not

7     the one dealing directly with the government.  I was.  And I

8     provided them everything that they asked for but, again, didn't

9     think it was my job to anticipate what they should have asked

10    for.

11         So with respect to that cooperation component, I -- I

12    think it's also worth mentioning that, you know, she also --

13    not only did she comply with law enforcement, but she did

14    comply and submit to a really lengthy proffer session.  She

15    also has complied completely with all the conditions of her

16    pretrial services -- so that has not been an issue at all --

17    and, certainly, entered the plea at her -- at her first

18    possible opportunity in light of her health complications,

19    which no one could have predicted.

20         With respect to the Prong No. 7, statements and postings

21    on social media, Ms. Prado didn't engage in any sort of

22    promotion of the January 6th attack and -- on social media

23    or -- or otherwise.  I know the prosecution makes reference to

24    the fact that her husband posted a video on his own Instagram.

25    Well, she certainly didn't encourage him to do so, and she

1    didn't do so.  She had multiple social media accounts.  She

2    didn't post it on any of hers.  His was a private account.

3    Again, you know, he actually was not charged because he never

4    entered the building.

5          But I don't believe that her husband posting something

6    without her encouragement should qualify as -- as anything

7    against her, particularly in light of the fact that the video

8    is something that he spontaneously narrated, and she,

9    obviously, in the video is not wild about the fact that he was

10   even filming and attempted -- made a halfhearted attempt to

11   kind of hide her face.

12         So, Your Honor, the final prong that they have mentioned

13   is whether or not the -- whether or not the defendant had any

14   sort of remorse or contrition, and, obviously, Ms. Prado has

15   expressed that in her letter.  She is remorseful for her

16   actions that day; very clearly, in retrospect, would not have

17   done it if given the opportunity to go back in time and -- and

18   has -- you know, has suffered substantially just with respect

19   to her own family, as well as been publicized quite -- quite a

20   bit in the -- in the news.

21         And I guess there's one story where the news took

22   particular interest in her because she was pregnant.  At one of

23   the status hearings that came out.  And so that in and of

24   itself became a whole -- became a whole story.  So she's --

25   she's certainly been the center of a lot of media inquiries as

1    well.

2         Your Honor, just a couple of other things.  One factor

3    that's not in the government's test, but I do think it's worth

4    pointing out, is her intentions in coming to D.C.  There are a

5    number of instances where individuals actually posted on social

6    media or texted other individuals about really wanting to come

7    to D.C. for the fight.  And that was not the case at all with

8    Ms. Prado.  Her intentions were quite clear.  Twofold, really.

9    One, to take photographs for her digital photography

10   assignment, and two, to peacefully protest in support of

11   President Trump -- former President Trump.  She's always

12   maintained that.  She never had any sort of preplanning, no

13   coordinated activities with anyone.  Certainly no hive mind, as

14   the prosecution suggests.  She didn't interact with anybody

15   that day and -- and did not engage in any sort of social media

16   posts after the fact.

17        She also, I think importantly, brought -- she didn't

18   bring any -- apart from -- she didn't bring any gear that would

19   indicate, like, an obvious intention or awareness that she was

20   going to be engaging in any sort of violent activity.  Some of

21   these individuals brought goggles or protective eyewear.  She

22   wasn't -- she didn't bring any of that.  It simply wasn't in

23   her mindset whatsoever.

24        With respect --

25             THE COURT:  The digital media class, I was a little

1    bit confused because when I looked at the exhibit, the date on

2    it seemed to postdate the events here.  So I was unclear as to

3    the actual chronology of things.

4         MS. ROBIN:  She, in fact, submitted photographs from

5    January 6th for that assignment.  If -- maybe the date might

6    have been from -- I don't know when she printed it out or when

7    she downloaded it, but the assignment -- and -- and she would

8    be happy, I think, you know, to -- to testify to this under the

9    oath -- under oath, if necessary.  The assignment, 100 percent,

10   predated January 6th and she, in fact, turned in photographs

11   from January 6th into the assignment, so...

12        Your Honor, in terms of general deterrence, you know,

13   the -- the government, I think, mentions in a lot of these

14   cases that -- the need for -- for general deterrence.  Specific

15   deterrence, I don't think, is as much of an issue in this case

16   because Ms. Prado, as you've seen for yourself, has a very

17   limited criminal history that predates her marriage.  The only

18   thing being the DWI and driving on suspended that predates her

19   marriage and children.

20        But in terms of general deterrence, I indicated in

21   this -- the memo -- and, certainly, it's the certainty of being

22   caught and not necessarily the harshness of the punishment that

23   really deters would-be offenders, but I also think it bears

24   pointing out -- and the government really touched on this in

25   their argument -- that the people who are the most responsible

1       for January 6th, the people in positions of power who engaged

2       in deliberate misinformation campaigns and encouraged the

3       invasion on the Capitol, they're the ones who need most to

4       be -- to be deterred.  Now, I think, you know, so far it hasn't

5       occurred that any of them have faced criminal prosecution.

6            But, certainly, overzealously punishing the least

7       culpable and nonviolent offenders, I don't believe, promotes

8       general deterrence and, arguably, is counterproductive to that

9       goal.  I don't -- again, in terms of the ultimate requirement

10      here, which is to issue a sentence that is no greater than

11      necessary to achieve the goals of 3553(a), I would just, I

12      guess, touch base, very briefly, on the fact of not only do we

13      believe that act of confinement is -- is greater than necessary

14      but also, I think, that home confinement in this case is not

15      necessary in order to achieve those factors.  And I say that in

16      light of her very limited conduct.

17           I know that the government makes reference to the fact

18      that she was in the building for 17 minutes, as were a number

19      of other individuals who were sentenced only to probation.  The

20      government makes reference to the location; that she made it,

21      you know, to one of the offices of the ranking member.  I would

22      submit that that location is much more relevant and important

23      to someone who knows or has some sort of an agenda, knows where

24      they're going.

25           Ms. Prado had never been in the building before, had no

1    idea where she was wandering.  She was following the crowd and

2    taking photographs.  Doesn't -- certainly doesn't forgive the

3    behavior of -- of entering and remaining in the building, but I

4    think it, again, distinguishes it from the behavior of

5    individuals who had a particular agenda, a particular, you

6    know, malicious agenda or intent to actually occupy these

7    offices.

8         When she walked into the office, she very quickly left

9    thereafter after realizing the -- observing the individual with

10   the beer that made her very uncomfortable and caused her to

11   leave and then to look for a public restroom, what she was

12   doing for several minutes, before she was eventually

13   encountered by an officer and asked to leave.

14        The only other thing I'll say on that point is it's also

15   particularly apparent from watching the CCTV footage that none

16   of the officers who encountered her viewed her as any sort of

17   threat whatsoever.  She encountered a number of officers.  In

18   this video, you can see lots of officers walking past.  I

19   counted, I think, at least half a dozen that she crossed paths

20   with.  Now, none of whom, you know -- none of whom made any

21   attempt to -- to tell her to leave or -- you know, or to --

22   certainly no physical attempt to get her to move.

23        And a lot of those -- I recognize in the building that

24   day, there were definitely areas where it was just so

25   overcrowded that it would have been impossible for police to

1    even interact with individual protesters.  A lot of the video

2    you see of her, she's, in some of them, the only one on screen.

3    In others there are -- you know, there are other individuals

4    about; but, most importantly, there wasn't the immediate --

5    again, I'm not criticizing the officers on that day.  I -- they

6    did everything that you would -- could imagine that they could

7    do in order to get through the day.

8         But judging from Ms. Prado's *mens rea,* her state of

9    mind, when she is walking around and crossing paths with

10   officers who are not asking her to leave, in -- in her head,

11   you know, that certainly distinguishes her from other

12   individuals who are in different areas of the building.

13        Finally, Your Honor, the only other thing I'll -- that I

14   do think is worth mentioning is in light of her limited

15   contact, in light of the fact that she's the primary caretaker

16   for two young children -- yes, she's married, but her husband

17   works two jobs.  Her husband, obviously, can't breastfeed the

18   infant.  So if she were -- if the government's request for

19   active jail time were granted, it would -- it would certainly

20   substantially interrupt the family, the children, and so forth.

21        Home confinement, though, Your Honor, also, I think, is

22   greater than necessary in light of her conduct and also in

23   light of the fact that she is someone who suffers from

24   postpartum depression.  She has been actively seeking

25   treatment.  She -- part of that treatment and, quite frankly,

1    socialization -- part of that treatment involves her going to

2    counseling sessions, but also part of it is just trying to get

3    out and about and socialization, including going to church

4    every Sunday at 2:00 p.m. for mass.  She and -- she takes her

5    two children every Sunday to mass.  In fact, her daughter's

6    baptism is coming up on February 20th.

7         So I think that given her mental health situation, home

8    confinement would certainly exacerbate the symptoms of

9    postpartum depression that she has experienced and is currently

10   experiencing.

11        THE COURT:  How about -- how about -- because I do

12   intend to impose something.  How would she be able to comply

13   with the curfew if home confinement would exacerbate, you know,

14   being in the house 24 hours a day with two infants and -- would

15   exacerbate her postpartum depression?  I understand that, and I

16   don't want to punish the kids either because they want -- you

17   know, especially in sunny south Florida, they want to get

18   outside.  How would a curfew work?

19        MS. ROBIN:  I think that curfew is a reasonable

20   option.  I -- I -- you know, certainly her socialization with

21   the children would occur, you know, during the day.  And so

22   I -- I -- I would suggest -- I don't know -- 7:00 p.m., but I'd

23   certainly defer to the Court on that.  I think that's a

24   reasonable -- reasonable balance.

25        THE COURT:  Okay.  Now, the husband, you had

1    mentioned that he -- that he travels on occasion, but when he's

2    not traveling, does he work out of an office or does he work in

3    the home remotely?

4              MS. ROBIN:  I will preface that by saying I can't say

5    with certainty.  My understanding is he works outside of the

6    home.  I think it is just Ms. Prado that works inside of the

7    home, but it's possible that he may do both.  Ms. Prado could

8    probably answer that question better.

9              THE DEFENDANT:  Yes.

10             THE COURT:  That's the other question I had.  Go

11   ahead, Ms. Prado.

12             THE DEFENDANT:  Thank you.

13       He does do both.  So sometimes he has to go out to

14   certain locations.  Sometimes he works from home.  It just all

15   depends.

16             THE COURT:  Okay.  All right.  Other than that

17   question, do you want to address the Court?

18             THE DEFENDANT:  Me?

19             THE COURT:  Yes.

20             THE DEFENDANT:  Sorry.  Not -- not at this moment, I

21   think.

22        Yes, I mean, I realize I should not have gone into the

23   building, and it is a decision that has haunted my family and

24   me ever since that's happened.  And I also have provided a

25   written statement, and it was filed by my attorney.  I decided

1    to file the written statement just because I tend to be able

2    to, I guess, express myself more clearly written as opposed to

3    verbally, especially with such a serious matter.  It made sense

4    to me to do it that way.

5              THE COURT:  Okay.  Thank you.

6         All right.  We'll start off with the financial issues.

7    With respect to restitution, the parties have agreed for a $500

8    payment to the Clerk of the Court to be forwarded to the

9    Architect of the Capitol as restitution.  So I will impose that

10   requirement.

11        There's a maximum fine of $5,000.  Although probation

12   has indicated that Ms. Prado does have an ability to pay a

13   fine, I believe only a modest fine is in order to help

14   compensate the government for a portion of its supervision of

15   defendant for the past year and into the next.  So I'm going to

16   impose a fine of $742.

17        The Court is to impose a sentence sufficient but not

18   greater than necessary to comply with the purposes of the

19   subsection.  I'm to consider the nature and circumstances of

20   the offense and the history and characteristics of the

21   defendant and impose a sentence that reflects the seriousness

22   of the offense, promotes respect for the law, and provides just

23   punishment for the offense.

24        Of course, the offense is serious.  A number of my

25   colleagues have spoken very eloquently about this.  The

1   defendant took part in a mob riot that took place at the

2   Capitol on January 6th, 2021.  Many of the rioters engaged in

3   violence and some destroyed property.  I have watched numerous

4   videos of rioters engaging in hand-to-hand combat with police

5   officials.

6          It was not a peaceful event.  More than a hundred law

7   enforcement officers were injured on that day.  Moreover, the

8   Capitol sustained almost $1.5 million in property damage.  Many

9   of the rioters intended to block the certification of the votes

10  for President Joe Biden, and although the rioters failed to

11  block that certification, they delayed it for several hours.

12         The security breach forced lawmakers to hide inside the

13  House gallery until they could be evacuated to undisclosed

14  locations.  In short, the rioters' actions threatened the

15  peaceful transfer of power and a direct attack on our nation's

16  democracy.

17         With that said, no evidence has been presented that

18  shows defendant assaulting law enforcement or destroying

19  property.  After entering the Capitol Building through an

20  entrance that was open by exiting rioters, defendant entered

21  the Capitol Building for about 17 minutes.  During that

22  17 minutes, however, she did cover a lot of ground, traveling

23  through different areas of the building, going to different

24  floors, and entered a private space, the House appropriations

25  room.  However, she did exit the building when police asked her

1    to do so.

2         The riot was successful in delaying the certification in

3    large part because of the numbers of participants involved,

4    which simply overwhelmed the outnumbered law enforcement

5    officers present.  So regardless of the defendant's intentions,

6    because she contributed to these numbers, she has to be held

7    accountable for her actions and the results to which her

8    actions contributed.

9         The defendant also moved the electronic evidence from

10   her phone to a thumb drive and -- which was not provided -- the

11   thumb drive was not provided to the FBI until later, after she

12   pled guilty during the required debriefing.  Although this

13   doesn't rise to the level of destruction of property, it does

14   evidence some concealment of what evidence she had and what

15   actions she took part of -- she took part in.  But other than

16   this, she was cooperative with the investigation by submitting

17   to an interview, providing the clothing she wore, and providing

18   access to her phone.  To her credit, she pleaded guilty at an

19   early juncture.

20        Otherwise, defendant has little criminal history.  She's

21   a 30-year-old mother of a 2-year-old infant and -- a 2-year-old

22   and an infant.  She has a college degree in graphic design.

23   She appears to have been gainfully employed for most of her

24   youth, but currently focuses the majority of her energies on

25   raising her two children.

1    However, the defendant's upbringing was not ideal.  Her

2    parents divorced when she was about 11.  She and her siblings

3    were kidnapped by her mother and taken to live in Bolivia,

4    receiving neglectful care while there for about a three-month

5    period until she was returned to Maryland.

6    Ms. Prado is now married to her husband who has a

7    stable, well-paying job in Florida.  So she appears to have a

8    strong family support system in place.

9    The Court is to impose a sentence that affords

10   deterrence to criminal conduct, protects the public from

11   further crimes of the defendant.  The events of January 6th

12   involved the rather unprecedented confluence of events

13   spurred by then President Trump and a number of his prominent

14   allies who bear much responsibility for what occurred on that

15   day.

16   Since her arrest, defendant seems to have done well

17   while on release status.  The Court is confident that given her

18   lack of prior criminal history and a lack of a violent past,

19   Ms. Prado is unlikely to reoffend, will not be emotionally

20   swept up in irrational actions, will not be a risk to the

21   public.  With respect to general deterrence, the Court does not

22   believe incarceration is necessary to deter other nonviolent

23   protesters from crossing the line into lawbreaking.

24   The defendant's ordeal through the criminal justice

25   system finds restitution, community service, and probation with

1    a possible home confinement or a curfew should serve as an

2    adequate deterrent to those that can be deterred.  The Court is

3    to provide the defendant with needed educational or vocational

4    training, medical care, or other correctional treatment in the

5    most effective manner.  Nothing has been brought to my

6    attention in this respect.

7         I'm to consider the kinds of sentences available.  Given

8    the nature of the crime and defendant's lack of criminal

9    history, the Court is considering a period of probation that

10   may contain restrictions and impose home confinement or a

11   curfew for a short period of time.  Even if the Court were

12   inclined to consider a short term of incarceration, it would

13   not be prudent to impose one given the COVID pandemic.

14        Moreover, given the defendant's child-caring

15   responsibilities and her suffering from postpartum depression,

16   home confinement doesn't necessarily seem appropriate given

17   that this may inadvertently exacerbate the postpartum

18   depression and indirectly impose a punishment on the two

19   children.  So the Court is also considering a curfew instead.

20        The Court is to assess the kinds of sentences and the

21   sentencing range established for the applicable category of

22   offense committed by the applicable category of defendant as

23   set forth in the guidelines.  The guidelines -- the Court is

24   cognizant that the guidelines don't apply here.  No pertinent

25   policy statements issued by the Sentencing Commission have been

1    brought to my attention.

2         The Court is to impose a sentence that avoids

3    unwarranted sentence disparities among defendants with similar

4    records who have been found guilty of similar conduct.  The

5    government had provided a chart that lists a number of the

6    January 6th defendant sentencings, but there is not enough

7    granular information there to make apt comparisons.  However,

8    the list does make it clear that the government has recommended

9    noncustodial home confinement probation sentences in a number

10   of these cases and in a limited number of cases proposed

11   straight probation.  The Court finds that hard to distinguish

12   this case from those.

13        We've already dealt with the $500 restitution as agreed

14   to by the parties that the Court will impose.

15        I will now indicate the sentence to be imposed, but

16   counsel will have one more opportunity to make any legal

17   objections before the sentence is actually imposed.

18        Ms. Robin, do you have any objections to any of the

19   factors I've considered?

20             MS. ROBIN:  No, Your Honor.

21             THE COURT:  Ms. Furst?

22             MS. FURST:  No, Your Honor.

23             THE COURT:  Okay.  Ms. Prado, it is the government --

24   it is the judgment of the Court that you are hereby sentenced

25   to serve a 12-month term of probation on Count 4.  This term of

1    probation shall also include a two-month term of a curfew from

2    7:00 p.m. to 7:00 a.m.

3            You are further ordered to pay a special assessment of

4    $10 and a fine of $742 as to Count 4.  You are ordered to make

5    restitution to the Architect of the Capitol in the amount of

6    $500, and these financial obligations shall be paid at a rate

7    of $105 per month.  Special assessment and fine are payable to

8    the Clerk of the Court for the U.S. District Court.

9            Within 30 days of any change of address, you shall

10   notify the Clerk of the Court of the change until such time as

11   the financial obligation is paid in full.

12           While on supervision, you shall not possess an illegal

13   controlled substance, and you shall not commit another federal,

14   state, or local crime.  You shall also abide by the general

15   conditions of supervision adopted by the U.S. Probation Office,

16   which will be set forth in the judgment and commitment order,

17   as well as the following special conditions:

18           You -- we will impose location monitoring where you will

19   be monitored by radiofrequency or GPS monitoring for the 60-day

20   period of the curfew, and as I indicated, the curfew will be in

21   effect from 7:00 p.m. to 7:00 a.m. for that 60-day period.

22   There will be some more details about the location monitoring

23   in the judgment and commitment order.

24           Until all the financial obligations imposed are

25   satisfied, there will be some financial information disclosure

1    requirements requiring you to give probation financial

2    information to assess your ability to pay the fine and the

3    restitution.

4         You shall also complete 60 hours of community service

5    within 6 months.  The probation office will supervise the

6    participation in the program by approving the program, and you

7    have to provide written verification of the completed hours to

8    a probation officer.

9         Counsel, any reason other than those previously stated

10   and argued why the sentence should not be imposed as just

11   stated?

12        Ms. Robin?

13            MS. ROBIN:  No, Your Honor.

14            THE COURT:  Ms. Furst?

15            MS. FURST:  No, Your Honor.

16            THE COURT:  Okay.  I'll impose the sentence as just

17   stated.

18        I gather that there are three counts, 1, 2, and 3, that

19   need to be dismissed from the information; is that right,

20   Ms. Furst?

21            MS. FURST:  Yes, Your Honor.  I so move.

22            THE COURT:  Okay.  That will be granted.

23        Ms. Prado, you were convicted by a plea of guilty.  You

24   can appeal your conviction if you believe that your guilty plea

25   was somehow involuntary or if there's some other fundamental

1    defect in the proceedings that was not waived by your guilty

2    plea, although I note that the guilty plea has an extensive

3    waiver of appellate rights or collateral attack rights.  So if

4    you're inclined to appeal, talk to your attorney about that.

5           And you also under certain circumstances have a

6    statutory right to appeal your sentence that wouldn't have been

7    waived by your guilty plea.  So talk to your attorney about

8    that as well.

9           To the extent you do appeal, you have the right to apply

10   for leave to appeal in forma pauperis.  That means without the

11   payment of costs.  And if you request and qualify, the Clerk of

12   the Court will prepare and file a notice of appeal on your

13   behalf, although I note you're represented by very able counsel

14   who can assist you in that process.

15          But, most importantly, with few exceptions, any notice

16   of appeal must be filed within 14 days of the entry of

17   judgment.  It usually takes two or three days to get the entry

18   of judgment posted on the docket.  So 14 days after that would

19   be when an appeal is due.

20          Probation has asked that the supervision be transferred

21   to the Southern District of Florida.

22          Does anyone have any objection to that?

23          Ms. Robin?

24              MS. ROBIN:  No, Your Honor.

25              THE COURT:  Okay.  Ms. Furst?

1          MS. FURST:  No, Your Honor.  I think that makes

2     sense.

3          THE COURT:  Okay.  So once I get the paperwork from

4     probation, I'll go ahead and enter that transfer as well.

5          THE PROBATION OFFICER:  Yes, Your Honor, a couple --

6     a couple points of clarification.  All drug testing has been

7     waived?

8          THE COURT:  I have not waived the drug testing.

9     There is -- the defendant does have some history of drug use,

10    although it doesn't seem to be recent, but I'm leaving the drug

11    testing in place.

12         THE PROBATION OFFICER:  Okay.  And if you could just

13    on the record -- I understand we're transferring jurisdiction,

14    but we have to have on the record it's okay to release the

15    presentence report and other documents to those other -- to the

16    other district.

17         THE COURT:  Of course.  You can release that

18    information to the other district.

19         THE PROBATION OFFICER:  Thank you.

20         THE COURT:  All right.  Anything else we need to

21    resolve today?

22         Ms. Robin?

23         MS. ROBIN:  No, Your Honor.  Thank you.

24         THE COURT:  Ms. Furst?

25         MS. FURST:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Ms. Prado, good luck to you.

2     Thank you.  You're excused.

3          (Proceedings were concluded at 12:08 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 10th day of March, 2022.

10

11                  /s/ Nancy J. Meyer
                    Nancy J. Meyer
12                  Official Court Reporter
                    Registered Diplomate Reporter
13                  Certified Realtime Reporter
                    333 Constitution Avenue Northwest
14                  Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25